IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALICE JAJUA, : | |
| Plaintiff, : | |
| v. : | CIVIL ACTION NO. 16-4730 |
| DIAKON LUTHERAN SOCIAL MINISTRIES, : | |
| d/b/a TWINING VILLAGE, : | |
| Defendants. : | |

**MEMORANDUM OPINION**

Rufe, J.                                                      March 19, 2018

Plaintiff Alice Jajua, a nurse, filed suit against her former employer, Diakon Lutheran Social Ministries, alleging race and national origin discrimination, retaliation, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964,[1] the Pennsylvania Human Relations Act,[2] and 42 U.S.C. § 1981. Defendant moves for summary judgment on all claims. For reasons that follow, the motion will be granted in part and denied in part.

**I.     BACKGROUND**

The following facts are undisputed, or where parties have presented conflicting evidence, construed in the light most favorable to Plaintiff as the non-moving party.

Defendant is the owner and operator of Twining Village, a nursing home facility that provides health care and rehabilitation services to the elderly and disabled.[3] Plaintiff is a licensed practitioner nurse ("LPN") who was born in Sierra Leone, lived in Liberia and Ghana, and immigrated to the United States in 2003.[4] She describes herself as black[5] and speaks with a

---

[1] 42 U.S.C. § 2000e, *et seq*.

[2] 43Pa. Stat. Ann. § 951, *et seq*.

[3] Stip. Fact ¶ 3.

[4] Stip. Fact ¶ 1; Pl.'s Exh. A (Jajua Dep.) at 9.

[5] Throughout her Complaint, her deposition, and her briefing, Plaintiff refers to her race as "black," and her nationality as "African." Plaintiff does not identify herself as "African American." Out of respect for Plaintiff, the Court will adopt the terms she uses.

discernable accent.[6] In October 2009, Defendant hired Plaintiff on an on-call per diem basis.[7] Throughout the first five years of her employment, Plaintiff received satisfactory performance reviews and raises, and in December 2012, she transitioned to a full-time position.[8]

The alleged discrimination and retaliation in this case began around November 2014 and lasted until Plaintiff's termination on September 4, 2015.[9] Starting in late 2014, a quality assurance nurse named Naomi Salas, who was later promoted to director of nursing, began making derogatory comments to Plaintiff. On two occasions, while Plaintiff was heating her food in the break room, Ms. Salas made derogatory comments about the smell of Plaintiff's food.[10] In addition, whenever Plaintiff worked overtime, Ms. Salas repeatedly commented that "Africans come to America and take our working hours and money," and told Plaintiff that "this is not a place for you" if she could not finish her job in eight hours.[11] Plaintiff reported these comments repeatedly to the Director of Nursing, Charissa Bermingham, and later to the Executive Director, Amy Bowen.[12] In response, Ms. Bermingham simply commented that "maybe Naomi is joking," and management made no efforts to stop the offensive conduct.[13] Other African nurses testified that they heard similar comments against Africans made by employees at Diakon.[14] Ms. Wangole, another nurse of African origin, witnessed multiple

---

[6] Stip. Fact ¶ 1; Pl.'s Exh. H (Bermingham Dep.) at 72.

[7] Stip. Fact ¶ 3.

[8] Pl.'s Exhs. B, C; Stip. Fact. ¶ 4.

[9] Stip. Fact ¶ 5.

[10] Jajua Dep. 40.

[11] Jajua Dep. 47, 149-150.

[12] Jajua Dep. 124-125.

[13] Jajua Dep. 40-42.

[14] Pl.'s Exh. F (Wangole Dep.) at p. 21-24, 35-36; Pl.'s Exh. S (Gboo Dep.) at 19-20, 44-45.

2

nurses repeatedly telling Ms. Jajua that she "do[es]n't speak English," that Africans "come over here and take our hours," and that she should go back to her own country.[15]

In January 2015, Plaintiff applied for a transfer from her "second shift" position, which lasted from 3:00 pm to 11:00 pm, to the more desirable "first shift" position, which lasted from 7:00 am to 3:00 pm, so she could care for her son after school.[16] Ms. Bermingham interviewed Plaintiff for the position and found her to be qualified, rating her "Communication Skills," "Interpersonal Work Relation," "Job Skills," "Attitude," and "Management Potential," as "Excellent."[17] However, Plaintiff was not transferred to her new position for nearly three months.[18] During this time, Plaintiff repeatedly asked Ms. Bermingham about the transfer, and was repeatedly told that she would start on the next pay period. At the same time, Plaintiff observed that nurses of other races were being assigned to fill the first shift position.[19] Plaintiff had previously witnessed other employees quickly transferred from second shift to first shift, including Plaintiff's Caucasian colleague, Lisa.[20] Plaintiff eventually approached Ms. Bermingham and asked her directly why she was not being transferred as promised, and according to the Plaintiff, Ms. Bermingham responded that her transfer was being delayed because "the doctors said because of your accent, they will not understand you."[21] Plaintiff reported the situation, including Ms. Bermingham's statement, to the Nursing Home

---

[15] Pl.'s Fact ¶ 55; Wangole Dep. 23-24, 27, 51.

[16] Stip. Fact ¶ 24; Pl.'s Fact ¶ 14; Wangole Dep. at 25, 26.

[17] Stip. Fact ¶ 25-26; Pl.'s Ex. I.

[18] Stip Fact ¶ 26.

[19] Jajua Dep. 38-39.

[20] Jajua Dep. 55, 150-151.

[21] Jajua Dep. 38-39, 136.

3

Administrator, Cindy Woodward.[22] Shortly afterwards, Ms. Bermingham transferred Plaintiff to first shift at the start of the next pay period, on March 18, 2015.[23]

The transfer did not go smoothly for Plaintiff. The unit manager for first shift was Amanda Leitenberger, whom at least one nurse had heard make derogatory comments concerning African food.[24] As part of her role, Ms. Leitenberger was responsible for relieving the nurses under her supervision so they could take breaks, but according to Plaintiff, Ms. Leitenberger consistently refused to relieve Plaintiff, so that she was often required to work an entire eight hour shift without a break.[25] Plaintiff complained to Ms. Leitenberger repeatedly that this was unfair and asked her why she refused to relieve Plaintiff but did so for other nurses.[26] Plaintiff also complained about the situation to the Executive Director, Amy Bowen.[27]

Between May and September of 2015, Plaintiff's previously satisfactory performance record devolved into a series of disciplinary investigations and write-ups that ultimately led to her termination. On May 8, 2015, Ms. Bermingham placed Plaintiff on an investigatory suspension based on an allegation that Plaintiff had been "rough" with a resident in repositioning him in his chair.[28] The resident's complaint did not refer to Plaintiff by name, but instead described an "African American" nurse or aid who wore a wig and glasses.[29] Plaintiff asserts

---

[22] Pl.'s Facts 26-27; Jajua Dep. 30-33, 38-39, 127-128, 135; Pl.'s Ex. L (Bowen Dep.) at 33.

[23] Jajua Dep. 30-33, 128; Pl.'s Ex. D (Woodward Dep.) at 20-21.

[24] Stip. Fact ¶ 8; Wangole Dep. 20.

[25] Jajua Dep. 50-52, 61.

[26] Jajua Dep. 51-52; Plaintiff's African colleague, a *per diem* nurse, observed that Caucasian nurses were regularly relieved to take their breaks, while Plaintiff went without her break. Wangole Dep. 42.

[27] Stip. Fact ¶ 11; Jajua 123-124.

[28] Def.'s Ex. R.

[29] *Id.*; Jajua Dep. 82-88; Bermingham Dep. 40.

4

that she did not wear a wig, that she had not moved the resident at issue, and that Ms. Bermingham misidentified her without investigating other nurses who fit the description.[30] The allegations were ultimately found to be "unsubstantiated," but Ms. Bermingham nonetheless imposed "disciplinary action and re-education, focusing on gracious hospitality and resident sensitivity," on Plaintiff.[31] On May 18, 2015, Ms. Bermingham issued a written warning against Plaintiff on the grounds that she had been "rough" and "aggressive" when providing care.[32] When deposed, Ms. Bermingham could not recall whether the May 18, 2015 written warning was based on the same incident reported on May 8, 2015.[33]

In August 2015, Plaintiff was again suspended based on a separate incident involving Ms. Leitenberger, during which Plaintiff allegedly refused to take a break when Ms. Leitenberger came to relieve her. According to Plaintiff, on August 17, after she asked Ms. Leitenberger to relieve her, Ms. Leitenberger abruptly approached Plaintiff and demanded that she hand over her keys and take her break immediately.[34] When Plaintiff requested additional time to complete her required tasks before taking her break, Ms. Leitenberger became angry and walked away.[35] Subsequently, Ms. Leitenberger issued a suspension report in which she accused Plaintiff of "unsatisfactory job performance, inability to complete task in [a] timely manner, inappropriate/unprofessional conduct at nursing station . . . e[.g.] yelling at nursing station" and

---

[30] Pl.'s Fact 37; Jajua Dep. 82-88.

[31] Def.'s Ex. R; Pl.'s Ex. O.

[32] Def.'s Ex. T.

[33] Bermingham Dep. 53-54.

[34] Jajua Dep. 52.

[35] Jajua Dep. 52, 98-99.

5

"refusing to take break."[36] The report attaches an "Employee Witness Statement" documenting an interview with the resident's family member who stated that she did not recall hearing anything on the day of the alleged incident, but that Plaintiff had been "abrupt" and "difficult to understand" in the past. The particular family member interviewed was known to be a chronic complainer within the nursing home.[37]

A few weeks later, on September 4, 2015, Plaintiff was terminated by Ms. Leitenberger and Billie DeRemer, Diakon's Employee Relations Manager. The asserted impetus for the termination was an alleged incident on September 1, 2015, during which a family member of a resident "complained that nurse did not care for resident on 9/1/15 in a professional manor [*sic*]" and stated that the "nurse was unable to identify a medication that she gave to a resident."[38] According to Plaintiff, on the day in question, she had provided blood pressure medication to the resident and identified the medication when asked.[39]

Ms. Jajua was replaced by a Caucasian employee, Belinda Janiszeqski.[40]

## II. STANDARD OF REVIEW

"The underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[41] A court will award summary judgment on a claim or part of a claim where there is "no genuine dispute as to any

---

[36] Def.'s Exhibit U.

[37] Pl.'s Ex. Q (Wiener Dep.) at 33-36, 62.

[38] Pl.'s Ex. W.

[39] Jajua Dep. 105-109; Exhibit Z.

[40] Pl.'s Exh. X at Rog. No. 7.

[41] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

material fact and the movant is entitled to judgment as a matter of law."[42] A fact is "material" if resolving the dispute over the fact "might affect the outcome of the suit under the governing [substantive] law."[43] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[44]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[45] Further, a court may not weigh the evidence or make credibility determinations.[46] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[47] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[48] Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[49]

## III. DISCUSSION

Defendant moves for summary judgment on each count of the Complaint, including Plaintiff's claims of race and national origin discrimination, retaliation, and hostile work environment.

---

[42] Fed. R. Civ. P. 56(a).

[43] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[44] *Id.*

[45] *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[46] *Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998).

[47] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[48] *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

[49] *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

7

A.  Race and National Origin Discrimination

Plaintiff asserts race and national origin discrimination under Title VII and the PHRA, and race discrimination under 42 U.S.C. § 1981.  A plaintiff may prove disparate treatment discrimination by her employer using either direct evidence of intent to discriminate or indirect evidence from which a court could infer intent to discriminate.[50]  The court will consider evidence as "direct" when the evidence is "so revealing of [discriminatory] animus" that it is unnecessary to rely on a burden shifting framework.[51]  Direct evidence "must be strong enough 'to permit the factfinder to infer that a discriminatory attitude was more likely than not a motivating factor in the [defendant's] decision'. . . [and] the evidence must be connected to the decision being challenged by the plaintiff."[52]

In the absence of direct evidence, courts evaluate indirect evidence of discrimination using the *McDonnell Douglas Corp. v. Green*[53] burden-shifting framework.  Under *McDonnell Douglas*, the plaintiff must first establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she was qualified for the position she sought to attain or retain; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.[54]  If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to "articulate some legitimate,

---

[50] *Turgeon v. Marriott Hotel Servs., Inc*., No. 99-4401, 2000 WL 1887532, at *5 (E.D. Pa. Dec. 27, 2000) (citing *Pivirotto v. Innovative Sys.*, Inc., 191 F.3d 344, 352 n.4 (3d Cir.1999)).

[51] *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010) (quoting *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 512 (3d Cir. 1997)); *Scott v. Genesis Healthcare, Inc.*, No. 15-0916, 2016 WL 4430650, at *8 (E.D. Pa. Aug. 22, 2016)

[52] *Anderson*, 621 F.3d at 269 (quoting *Walden*, 126 F.3d at 513, 515-516) (internal quotation marks omitted)); *Scott, Inc.*, 2016 WL 4430650, at *8 (internal citations omitted).

[53] 411 U.S. 792 (1973).

[54] *Sarullo v. U.S. Postal Serv*., 352 F.3d 789, 797 (3d Cir. 2003).

nondiscriminatory reason" for the adverse action against the employee.[55] The plaintiff then must establish by a preponderance of the evidence that the employer's proffered reasons were merely a "pretext for discrimination, and not the real motivation for the unfavorable job action."[56] A plaintiff may demonstrate pretext, and so defeat a motion for summary judgment, by either "(i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."[57]

Here, Plaintiff asserts race and national origin discrimination based on 1) Defendant's delay in transferring her to first shift; and 2) Defendant's disciplinary actions against her, culminating in her termination.

1. Discriminatory refusal to transfer

At the outset, Defendant contends that Plaintiff's delay in transferring Plaintiff does not constitute a cognizable adverse employment action as a matter of law. The Court disagrees. An "adverse employment action" is an action that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."[58] To meet this standard, the adverse action must be more disruptive than a "mere inconvenience."[59] Here, Plaintiff has provided evidence that for nearly three months, Defendant denied Plaintiff a shift transfer for which she had been found qualified, opting to fill the opening with nurses of other

---

[55] *Sarullo,* 352 F.3d at 797.

[56] *Id.*

[57] *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994).

[58] *Storey v. Burns Int'l Sec. Services,* 390 F.3d 760, 764 (3d Cir. 2004) (citations omitted).

[59] *Glanzman v. Metro. Mgmt. Corp.*, 290 F. Supp. 2d 571, 582 (E.D. Pa. 2003), *aff'd*, 391 F.3d 506 (3d Cir. 2004).

9

races. Plaintiff has also presented evidence that first shift was generally more desirable for the nurses at Diakon, and that Defendant's refusal to transfer her impeded Plaintiff's ability to care for her son after school. Courts have found similar facts to be sufficient to establish an adverse employment action. Specifically, the Third Circuit has held that a change in shift may materially affect the terms and privileges of an employee's employment,[60] and at least one court in this circuit has reached the same conclusion with respect to the denial of a transfer or a delay in promotion.[61]

In arguing to the contrary, Defendant relies primarily on two cases from other circuits, which the Court finds unpersuasive here. In *Amro v. Boeing Co.*,[62] the court held that the plaintiff could not assert an adverse employment action based upon the defendant's delay in transferring him to a different position.[63] But there, the court found that the plaintiff failed to establish that there had been "actual positions for which he was qualified and which he was denied."[64] Similarly, in *Ingram v. Brink's, Inc.*,[65] the court held that a delay in the plaintiff's promotion was not actionable because it constituted "nothing more than delays in the decision

---

[60] *Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 788 (3d. Cir. 1998) ("Assigning an employee to an undesirable schedule can be more than a 'trivial' or minor change in the employee's working conditions."); s*ee also Clemena v. Philadelphia Coll. of Osteopathic Med.*, No. 17-428, 2017 WL 3453338, at *5 (E.D. Pa. Aug. 11, 2017) (recognizing denial of transfer claim but dismissing for failure to allege elements with sufficient specificity); *Fiocca v. City of Philadelphia*, No. 10-1289, 2011 WL 1155880, at *2 (E.D. Pa. Mar. 28, 2011) (recognizing denial of transfer and shift change as adverse action); *Salvato v. Smith*, No. 13-2112, 2013 WL 3431214, at *8 (E.D. Pa. July 9, 2013) (citing *Seldon v. Nat'l R.R. Passenger Corp.,* 452 F. Supp. 2d 604, 609 (E.D. Pa. 2006) ("[F]ailure to transfer an employee to a position to which she was qualified can also constitute an adverse employment action.")).

[61] *See, e.g.*, *Harley v. Paulson*, No. 07-3559, 2008 WL 5189931, at *3 (D.N.J. Dec. 9, 2008) (finding that allegations that an employer delayed promoting the plaintiff until 2006 and refused to adequately accommodate his back injury by permitting a temporary transfer, if taken as true, are sufficient to suggest that he suffered an adverse employment action altering his compensation, terms, conditions, or privileges of employment).

[62] 232 F.3d 790 (10th Cir. 2000).

[63] *Id*. at 797-98.

[64] *Id.* at 798.

[65] 414 F.3d 222 (1st Cir. 2005).

10

making process."[66] There, the court noted that no one else was hired for the management position at issue during the period of delay in promoting the plaintiff. By contrast, in this case, a reasonable fact finder could conclude that Ms. Bermingham's delay in transferring Plaintiff to first shift was more than the result of administrative delays because there was an open position for which Plaintiff had been found qualified, and because Plaintiff observed nurses of other races being transferred into first shift during the period of delay. Accordingly, Plaintiff has presented sufficient evidence that the delay in her transfer constituted an adverse employment action.

Defendant also contends that Plaintiff has not provided sufficient evidence to support an inference of discriminatory intent. Specifically, Defendant asserts that any statement by Ms. Bermingham that Plaintiff's transfer was delayed because of her accent is not direct evidence of discrimination because an employer can legitimately consider an employee's oral communication skills in evaluating his or her qualifications. But in this case, at the time Ms. Bermingham made the alleged statement concerning Plaintiff's accent, Plaintiff had already been found qualified for the transfer at issue, including with respect to her "communication skills."[67] Moreover, at the time, Plaintiff had worked at Twining Village for over five years without documented concerns about her ability to communicate, and Defendant has offered no explanation for why her work on an earlier shift would require different oral communication skills than her work on a later shift. Finally, the fact that Ms. Bermingham immediately processed the transfer after her comments were reported to the executive director further supports the inference that her delay was not motivated by legitimate concerns regarding Plaintiff's qualifications.

---

[66] *Id*. at 231.

[67] Pl.'s Ex. I.

Moreover, even without direct evidence of discriminatory intent, Plaintiff has provided sufficient indirect evidence to sustain an inference of discrimination based on Plaintiff's race and national origin. Plaintiff was eligible for the transfer, but has adduced evidence that the transfer was delayed for three months while nurses of other races were being transferred to first shift in her place. She also identified a Caucasian colleague, Lisa, who was transferred to another shift without the delay that attended Plaintiff's transfer. Moreover, Ms. Bermingham's refusal to address complaints concerning derogatory comments made by other nurses could further support an inference of discriminatory intent.

Accordingly, a reasonable fact finder could conclude that Defendant's delay in transferring Plaintiff to first shift was an adverse employment action that was motivated by discrimination based on race and national origin. Defendant's motion will be denied with respect to this claim.

2. Discriminatory Disciplinary Actions and Termination

With respect to Plaintiff's discrimination claims based on her termination and the preceding disciplinary actions, Defendant contends that Plaintiff has failed to establish that Defendant's proffered justifications are pretextual. The Court addresses each of the disciplinary actions at issue in turn.

*a. May 2015 Disciplinary Actions*

Construing the evidence in the light most favorable to Plaintiff, a fact finder could conclude that the May 6, 2015 investigatory suspension and May 18, 2015 written warning against Plaintiff both arose from an incident in which a resident complained that a nurse or

clinical nurse assistant, who was African American, wore a wig, and had glasses, was abusive in repositioning the resident in his chair.[68]

Defendant asserts that the resulting disciplinary actions cannot be pretextual because Defendant is obligated by law and its own written policies to investigate and address all allegations of abuse made by a resident. However, Plaintiff contends that regardless of Defendant's duty to investigate, Ms. Bermingham unjustifiably chose to discipline Plaintiff rather than investigate other nurses and aides who were not of recent African origin, and more accurately met the resident's description. Plaintiff's testimony that she was mistakenly identified, in conjunction with evidence of Ms. Bermingham's earlier statements concerning Plaintiff's accent and her refusal to address derogatory comments made against Plaintiff in the workplace, may support a claim of national origin discrimination based on Ms. Bermingham's decision to investigate Plaintiff rather than other nurses who were not of recent African origin. However, the evidence shows that the resident identified the nurse's race, and therefore Plaintiff cannot establish that race discrimination motivated Defendant's investigation.

Accordingly, at trial, Plaintiff will be permitted to assert a claim of national origin discrimination, but not race discrimination, based on the May 2015 disciplinary actions against her.

### b. *August 2015 Disciplinary Action*

Plaintiff was disciplinarily suspended in August 2015 based on Ms. Leitenberger's allegations that Plaintiff yelled loudly across the nursing station, and acted disrespectfully towards patients and their visiting families. During her deposition in this case, Plaintiff testified that the allegations are false, and that on August 17, 2015, after Plaintiff had asked Ms.

---

[68] Def.'s Exhs. R, T; Bermingham Dep. 53-54; Jajua Dep. 82-88.

Leitenberger to relieve her for a break, Ms. Leitenberger abruptly approached Plaintiff while she was administering medication to a resident and demanded that she take a break and hand over her key to her medication kiosk immediately.[69] When Plaintiff asked Ms. Leitenberger to wait until she had completed her necessary tasks, Ms. Leitenberger became angry and left the scene.[70]

Plaintiff's testimony is sufficient to create a genuine dispute of fact over the credibility of the assertions underlying the August 2015 disciplinary action. A reasonable fact finder could choose to credit Plaintiff's version of the events on August 17, 2015 over the account provided in the disciplinary report and conclude that Defendant's allegations were pretextual. Accordingly, Plaintiff will be permitted to proceed with her race and national origin discrimination claims based on her August 2015 disciplinary suspension.

c. *September 2015 Termination*

Defendant asserts that Plaintiff's termination was based on Plaintiff's past disciplinary actions and triggered by a complaint from a resident's daughter alleging that Plaintiff was unable to identify the resident's medication. In response, Plaintiff testified during her deposition that she correctly identified the medication to the resident, and that the allegations against her are implausible because even if she was not familiar with the resident's medication, she could easily look up the medication on the computer or on her phone.[71] No written statements or testimony from the family member have been produced, and Ms. Leitenberger has given conflicting accounts of the manner in which she received the family member's complaint.[72] In light of the

---

[69] Jajua Dep. 52.

[70] *Id*. at 52, 98-99.

[71] Jajua Dep. 104-106.

[72] Pl.'s Ex. K (Leitenberger Dep.) at 63-64, 62-63 (testifying that the family called her twice and complained about Plaintiff over the phone); Pl.'s Exh. AA (Leitenberger Unemployment Proceedings Transcript) at

14

conflicting testimony of Ms. Leitenberger and Plaintiff, there is a genuine dispute of material fact concerning this incident. Moreover, Ms. Leitenberger testified that the only other employee terminated during her tenure was provided with a performance improvement plan and a final warning termination, while Plaintiff was not provided with the same administrative steps.[73] This, in conjunction with Plaintiff's extensive history of satisfactory performance reviews and evidence of Ms. Leitenberger's past hostility toward Plaintiff, would allow a reasonable fact finder to conclude that Defendant's grounds for terminating Plaintiff were pretextual.[74]

### B. Retaliation

To establish a *prima facie* case of retaliation under the *McDonnell Douglas* framework, Plaintiff must bring forth evidence that (1) she engaged in a protected employee activity; (2) Defendant took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action.[75] Activities protected from retaliation include the initiation of formal EEOC proceedings as well as "informal protests of discriminatory employment practices, including making complaints to management."[76] For an informal employee complaint to constitute a protected activity, "it must be possible to discern from the context of the statement that the employee opposes an unlawful employment practice."[77] If Plaintiff can establish a *prima facie* case of

---

11-12 (testifying that the family member approached Ms. Leitenberger in person, pulled her aside, and asked her to switch assignments for her mother); DeRemer Dep. at 24.

[73] Leitenberger Dep. 38-41.

[74] *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination").

[75] *Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 462, 482 (E.D. Pa. 2013) (citation omitted), *aff'd*, 776 F.3d 181 (3d Cir. 2015).

[76] *Curay-Cramer v. Ursuline Acad. of Wilmington, Dela.*, 450 F.3d 130, 135 (3d Cir. 2006).

[77] *Id.* (citation omitted).

retaliation, the burden shifts to Defendant to articulate a non-retaliatory reason for the adverse employment action, which Plaintiff can then rebut with evidence of pretext.[78]

Defendant contends that Plaintiff has failed to establish that she engaged in any protected activity. Plaintiff has testified that she (1) complained to Cindy Woodward regarding the delay in her transfer and informed her of Ms. Bermingham's purported reasons for the delay;[79] (2) complained to Ms. Bermingham and Ms. Bowen concerning derogatory comments made by Ms. Salas;[80] and (3) complained to Ms. Leitenberger and Ms. Bowen concerning Ms. Leitenberger's refusal to relieve Plaintiff for her breaks.[81]

A reasonable fact finder could conclude that these complaints to management, in context, were discernibly directed to discriminatory conduct. First, Plaintiff's repetition of Ms. Bermingham's and Ms. Salas's statements concerning Plaintiff's accent and food would lead a reasonable person to discern that Plaintiff was alleging discrimination on the basis of national origin. Second, Plaintiff testified that in complaining about Ms. Leitenberger's failure to relieve her, she specifically pointed to Ms. Leitenberger's willingness to relieve other nurses.[82] Plaintiff also testified that to her knowledge, she was the "only black full-time nurse there,"[83] from which a reasonable fact finder could conclude from this testimony that Plaintiff was making a discernible complaint of race discrimination.[84]

---

[78] *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015); *Dunn v. Mercedes Benz of Ft. Washington, Inc.*, No. 10-1662, 2012 WL 424984, at *4 (E.D. Pa. Feb. 10, 2012).

[79] Jajua Dep. 30-33, 38-39, 127-128, 135.

[80] *Id*. at 40-42, 46-47.

[81] Jajua Dep. at 51-52, 122-123, 143.

[82] Jajua Dep. at 122-123.

[83] *Id*.

[84] Although Defendant disputes Plaintiff's assertion that there were no other black full time nurses at Diakon, a reasonable fact finder could reach the same conclusion so long as Plaintiff was reasonably perceived to be

Defendant also contends that even if Plaintiff could establish a *prima facie* case of retaliation, Plaintiff has failed to show that Defendant's proffered reasons for disciplining and terminating her were pretextual. This argument fails for the same reasons discussed above with respect to Plaintiff's discrimination claims. Specifically, Plaintiff provides alternative accounts of each of the incidents giving rise to the disciplinary actions that, together with her history of satisfactory performance, and the proximity in time between her protected activities and the disciplinary actions in question, are sufficient to raise genuine disputes of material fact as to pretext.

C.     **Hostile Work Environment**

To prove a hostile work environment claim under Title VII, §1981, or the PHRA, Plaintiff must establish that (1) she suffered intentional discrimination; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would have affected a reasonable person in the same position; and (5) there is a basis for employer liability.[85] In determining whether the conduct at issue is sufficiently severe or pervasive, a court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[86]

Here, Plaintiff offers evidence of the following alleged conduct: (1) employees at Diakon, including Ms. Salas, who later became director of nursing, commented that Africans came to America to take the money and jobs of others, and specifically made such comments to Plaintiff

---

one of few black nurses whom Ms. Leitenberger was responsible for relieving. Moreover, Defendant has not pointed specifically to other black full-time nurses whom Ms. Leitenberger was responsible for relieving, but instead points generally to other black and African employees at Diakon. Def's Resp. to Sur-Reply at 4 n.2.

[85] *Dykes v. Marco Grp., Inc*., 222 F. Supp. 3d 418 (E.D. Pa. 2016).

[86] *Id*. at 430 (citation omitted).

17

when she took on a double shift or stayed past the end of her shift;[87] (2) Ms. Salas made derogatory comments about Plaintiff's food, and others asked derogatory questions about life in Africa (*e.g.*, whether Africans lived in trees and whether they wore shoes);[88] (3) Ms. Bermingham intentionally delayed Plaintiff's transfer to first shift because of her accent;[89] (4) Plaintiff was repeatedly disciplined following her transfer to first shift;[90] (5) Plaintiff's unit manager, Ms. Leitenberger, whose role was to relieve the nurses under her supervision on first shift, refused to relieve Plaintiff, forcing her to work eight hour shifts without a break;[91] (6) on one occasion, when Plaintiff asked Ms. Leitenberger to relieve her, Ms. Leitenberger harshly ordered Plaintiff to take a break immediately, and disciplined her when she asked for additional time to complete her task.[92]

Defendant argues that these events are insufficient to establish the third prong of plaintiff's *prima facie* case. The Court disagrees. First, contrary to Defendant's contention, discriminatory conduct need not be both severe and pervasive to form the basis of a hostile work environment claim. Under the Third Circuit's holding in *Castleberry v. STI Group*, the "severe or pervasive" element is disjunctive.[93] Second, the alleged derogatory comments made against Plaintiff, when coupled with the delay in her transfer and disciplinary actions against her, could lead a reasonable fact finder to conclude that Defendant's conduct was both severe and pervasive enough to alter the conditions of Plaintiff's employment.

---

[87] Jajua Dep. 40-41, 45, 47; Pl.'s Exh. S (Gboo Dep.) at 12-13, 18-19, 28-29, 54.

[88] Jajua Dep. at 40, 45; 149-50; Wangole Dep. at 20-25, 27-28, 34-36, 51-52; Gboo Dep. at 42-45.

[89] Jajua Dep. 38-39, 136.

[90] Def.'s Exhs. R, T, U, V.

[91] Jajua Dep. 50-52, 60-61; Wangole Dep. at 42.

[92] Jajua Dep. 52, 98-101.

[93] *Castleberry v. STI Grp.*, 863 F.3d 259, 265 (3d Cir. 2017).

Defendant also contends that the disciplinary actions against Plaintiff cannot form the basis for a hostile work environment claim because they were motivated by legitimate reasons. But for the same reasons discussed above with respect to Plaintiff's discrimination and retaliation claims, a reasonable fact finder could conclude that Defendant's stated reasons were not credible.

## IV. CONCLUSION

For the reasons discussed above, Defendant's motion will be granted as to Plaintiff's race discrimination claim based on the May 2015 investigatory suspension and written warning against her, and denied in all other respects. An order follows.